**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UROMED TECHNOLOGY INC., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 09 CV 3493 |
| | ) | |
| v. | ) | Judge Gottschall |
| | ) | |
| THOMAS F. REINER, et al. | ) | Magistrate Judge Cole |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION AND IMPROPER VENUE, OR IN THE
ALTERNATIVE TO TRANSFER FOR IMPROPER VENUE OR FOR CONVENIENCE**

NOW COME Plaintiffs UroMed Technology, Inc., Michael Y. Granger, Kenneth E. Feltman, and the Kenneth Feltman Insurance Trust, by and through their attorney, Brian R. Porter, to oppose the Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, or in the Alternative to Transfer for Improper Venue or for Convenience ("Motion to Dismiss"), for the reasons stated below:

**Preliminary Statement**

The Court could read through the Defendants' Supporting Memorandum several times over without ever becoming aware that this dispute is over assets that

- were originally owned and marketed by an *Illinois* corporation;

- were actively solicited by the Defendants for many months in communications directed at *Illinois*;

- were transferred to the Defendants pursuant to an Asset Purchase Agreement governed by *Illinois* law at a closing in *Illinois*;

- were transferred to the Defendants only because Defendant Reiner persuaded the Feltman Plaintiffs to send $200,000 to *Illinois;*

- were transferred to the Defendants only as a result of a meeting between the principals (Reiner, Granger, and Feltman) in *Chicago*;

- continue to be operated in *Illinois* under an agreement that Plaintiffs believe is also governed by *Illinois* law; and

- are generating substantial revenue that is being sent to the Defendants from *Illinois*.

Like the dog that did not bark in the Sherlock Holmes short story,[1] this silence of the Defendants speaks volumes about the weakness of their Motion to Dismiss.

To be sure, the Defendants refer obliquely to the fact that these disputed assets – known as the "Evadri Bladder Control business unit" – were acquired from a company called Hollister Inc. in January 2009, see Defendants' Memorandum in Support at 3 ("Defs. Supp. Memo. at ___"), yet they somehow fail to mention anything about Hollister itself, such as the crucial and dispositive fact that Hollister is the Illinois corporation in question, with its principal place of business in Libertyville, Illinois.  This fact alone makes the Northern District of Illinois the most important forum for both personal jurisdiction and venue analysis.

Even if Hollister had no connection to Illinois, personal jurisdiction would be established in Illinois by virtue of the meeting that Plaintiffs acknowledge occurred at the Seneca Hotel in Chicago, Illinois on December 9-10, 2008.  Far from being an "inconsequential" meeting at which "no agreement" was reached, Defs. Supp. Memo. at 6,

---

[1] "Is there any point to which you would wish to draw my attention?"

"To the curious incident of the dog in the night-time."

"The dog did nothing in the night-time."

"That was the curious incident," remarked Sherlock Holmes."

-- *Silver Blaze* by Sir Arthur Conan Doyle

this was the only face-to-face meeting between Reiner, Granger, and Feltman prior to the disputed events, and it was at this meeting that they reached the necessary agreements and understandings that led to the formation of Plaintiff UroMed Technology, Inc. just six days later.   Under proper jurisdictional analysis this single act is of sufficient quality and significance to justify "specific jurisdiction" over Reiner under the Illinois Long-Arm Statute.

Even if this meeting were not sufficient, the Court can presume that Reiner, as the principal negotiator for the acquisition of the Evadri assets, engaged in significant communications with Hollister and multiple visits to Hollister during the months that preceded the Evadri acquisition.   Certainly, Reiner does not deny doing so, and at the very least, the Plaintiffs should be allowed to conduct jurisdictional discovery of Reiner and Hollister to determine the extent of Reiner's contacts with Hollister (and hence Illinois) prior to the Evadri acquisition.   By the same token, Reiner's contacts with Illinois can serve as a basis for personal jurisdiction over Defendants Brewer Reiner (whom Reiner neglects to mention is his wife), Spectra Group, Inc., and the LKDTBJP Trust, if as seems quite likely, these Defendants conspired with Reiner in an attempt to seize majority control of UroMed and/or to commit fraud by inducing the Feltman Plaintiffs to send $200,000 to Hollister in consideration of promises that they never intended to keep.   These issues are all ripe for jurisdictional discovery, as is the issue of whether Spectra Group and the LKDTBJP Trust (both of which are owned and controlled by the Reiners) are simply shell legal entities serving as alter egos for Reiner and/or Brewer Reiner.

Lastly, the same jurisdictional facts that justify invocation of the Illinois Long-Arm Statute also make venue in this forum proper since "a substantial part of the event or omissions" relating to the Evadri acquisition occurred in this District.   Indeed, the only third-party witnesses involved will be from Hollister, which would only be subject to

compulsory process in this District.  Similarly, regardless of what corporate records are located with the Defendants in California, the key records will be financial in nature and these all originate with Hollister, which is still operating the Evadri business unit in Illinois under a Transition Services Agreement as part of the Evadri acquisition.  A transfer of this case to California for "convenience" or the "interests of justice" therefore would be unjustified and inappropriate.

## **Statement of Facts**

This action was initially filed in the Circuit Court for Cook County to resolve a dispute over the ownership and control of Plaintiff UroMed Technology, Inc. ("UroMed"). The genesis of this shareholder dispute is a two-day meeting on December 9-10, 2008, between Defendant Thomas F. Reiner ("Reiner") and Plaintiffs Michael Y. Granger ("Granger") and Kenneth E. Feltman ("Feltman") at the Seneca Hotel in Chicago, Illinois ("Seneca Hotel Meeting").  Reiner had requested this meeting in order to solicit monies from Feltman as investment capital for a medical device company yet to be formed, but which would be used as the vehicle for acquiring certain assets from Hollister Incorporated ("Hollister") of Libertyville, Illinois, specifically Hollister's "Evadri Bladder Control" business unit ("Evadri").  See Joint Affidavit of Michael Y. Granger and Kenneth E. Feltman at ¶ 3 (attached hereto as Plaintiff's Exhibit 1 ("Pls. Ex. ___"); hereafter "Jt. Aff. at ¶ __").

Reiner had previously represented himself to both Granger and Feltman as a highly capable healthcare professional with over 35 years of experience in the sale, marketing, manufacturing, and distribution of medical devices, as well as in the regulatory, financial, and senior management of companies in the medical device industry. The purpose of the Seneca Hotel Meeting was to agree on the terms for establishing this new medical device

company (subsequently formed as UroMed), including ownership shares, Board membership, and officer positions of the new company. An essential element of this transaction was the transfer of assets from existing medical device company owned or controlled by Reiner, which Reiner represented as a Massachusetts corporation called Spectra Medical Products, Inc. ("Spectra-Massachusetts") and which he (Reiner) also asserted was an ongoing business with an established financial history and current value of $300,000 to $350,000. See Jt. Aff. at ¶ 4 (Pls. Ex. 1).

At the conclusion of the Seneca Hotel Meeting, Feltman agreed to invest in the new company, and Reiner agreed with Granger and Feltman to the following terms and conditions for incorporating what soon became UroMed and for receiving this $200,000 investment to acquire Evadri from Hollister ("Seneca Hotel Agreement"):

- Upon its incorporation, Reiner and Granger would each receive an equal number of shares of common stock in the new company;

- Feltman (or an entity aligned with Feltman) would invest $200,000 in return for an undiluted twenty-five percent (25%) ownership of the common stock of the new company;

- The remaining 75% would be split 37.5%-37.5% between Reiner and Granger on a provisional basis, subject to a valuation by an independent certified public accountant suitable to all parties of the "Spectra" assets;

- If the "Spectra" assets were valued at exactly $300,000, then Reiner's and Granger's stockholdings would remain at 37.5% each. If the "Spectra" assets were valued over $300,000, then Reiner's stockholding would be adjusted proportionately upward to a potential maximum of 41.67%. Conversely, if the "Spectra" assets were valued under $300,000, then Reiner's stockholding would be adjusted proportionately downward to a potential minimum of zero percent.

- If Reiner's stockholding was adjusted downward, then Granger's and Feltman's stockholdings would be adjusted upward in proportion to their original 37.5% and 25% stockholdings; or in other words, three shares to Granger for every two shares to Feltman.

● Reiner would serve as the initial President and Chief Executive Officer and report to the UroMed Board, which would consist of three directors, with Reiner, Granger, and Feltman each serving as a director.

● If the number of directors were ever increased or decreased, Feltman would be permitted to appoint himself or any designee or designees so that he would control at least one-third of all Board seats. In other words, if the Board were increased to seven members, or eight members, or nine members, Feltman would be able to designate three directors. At no time would Feltman's right to designate at least one-third of the Board members be abrogated without his specific written consent.

See Jt. Aff. at ¶ 5 (Pls. Ex. 1).

Contrary to Reiner's claim that no agreement was reached until "well after the [Seneca Hotel] meeting took place," Defs. Supp. Memo. at 8 & 9, *it was less than a week late*r, on December 16, 2008, that Reiner arranged for an attorney in Boston, John A. Kostrubanic, to incorporate UroMed as a Massachusetts corporation. According to the Articles of Organization on file with the Massachusetts Secretary of State, UroMed was authorized to issue 275,000 shares of common stock at a par value of $0.001, of which 100,000 shares were supposedly issued and outstanding, although this never appears to have actually happened. See Articles of Organization dated December 16, 2008 (attached hereto as Pls. Ex. 2). In addition, Kostrubanic, as sole incorporator, adopted the corporation's Bylaws; fixed the number of Board members at 3 directors; elected Reiner and Granger to the Corporation's Board of Directors; elected Reiner as President, Treasurer, and CEO of the Corporation; and elected Granger as Chairman of the Board of Directors. See Initial Written Consent Action of the Sole Incorporator dated December 16, 2008 (attached hereto as Pls. Ex. 3; also filed as Reiner Exhibit E). Although this written consent by Kostrubanic purports to elect Denise A. Brewer as Corporate Secretary, in fact Granger was the Corporate Secretary according to Kostrubanic's official filing with the

Massachusetts Secretary of the Commonwealth.    <u>See</u> Articles of Organization dated December 16, 2008 at 2 (Pls. Ex. 2).[2]

Two days later, on December 18, 2008, Reiner executed an Asset Purchase Agreement purportedly on behalf of UroMed, but without the knowledge of Granger or Feltman, to acquire certain assets of a Delaware corporation called Spectra Group, Inc. ("Spectra-Delaware"), one of the Defendants in this case.    <u>See</u> Spectra-Delaware Asset Purchase Agreement (attached hereto as Pls. Ex. 4; also filed as Reiner Exhibit C); Jt. Aff. at ¶ 7.    Reiner's wife, Defendant Denise Brewer Reiner ("Brewer Reiner") countersigned this document as the President of Spectra-Delaware and its controlling shareholder.    <u>Id</u>. (signature page).

In exchange for selling these assets to UroMed, Spectra-Delaware was issued 125,000 shares of UroMed common stock (par value $0.001), plus warrants to buy 125,000 shares of UroMed common stock at a strike price of $0.50 per share.    <u>Id</u>. at § 2.4 (Purchase Price).    In addition, UroMed was supposed to assume certain liabilities of Spectra-Delaware, as evidenced by a promissory note in the amount of $58,337, payable at an interest rate of seven percent (7%) in monthly amounts of $1,620 over thirty-six (36) months.    <u>Id</u>. at Exhibit 2.2(iii).    Lastly, Reiner Brewer was promised a "senior management" position at an initial annual base salary of $72,000, to be increased annually by a minimum of ten percent (10%), plus a $300 per month car allowance and certain health benefits, and

---

[2]    In his sworn affidavit, Reiner relies on Kostrubanic's written consent as sole incorporator to support his claim – strongly contested by the Plaintiffs – that his wife was the initial Corporate Secretary and thus that Granger knew "Brewer Reiner would become an officer and a member of the Board of Director of UroMed" prior to December 16, 2008.  Reiner Affidavit at ¶ 8.  Significantly, while filing the UroMed Articles of Incorporation as an attachment to Reiner Exhibit E, Reiner fails to alert the Court to the fact that the Articles of Incorporation contradict this claim by identifying Granger as Corporate Secretary, thereby giving the Court a false impression of the documentary record on this point.

a director's seat on the UroMed Board, effective immediately (December 18, 2008).  Id. at § 4.11 (Vice President/Appointment to Buyer's Board of Directors).  Neither Granger nor Feltman were informed of Reiner's scheme to execute this Asset Purchase Agreement or hire his wife and issue shares and warrants to his wife's company, and at no time did Granger or Feltman ever authorize Reiner to take these actions.  See Jt. Aff. at ¶ 7.

Contemporaneously with the execution of the Spectra-Delaware Asset Purchase Agreement, Reiner also prepared and executed a series of written consent actions of the UroMed Board, again without the knowledge or approval of Granger or Feltman, although these are the documents that Defendants now refer to as the "operative agreements … executed in California" (see Defs. Supp. Memo. at 8 & 9):

- The first such written consent action purportedly issued 125,000 of the 275,000 authorized shares of common stock to an entity owned or controlled by Reiner, the "LKDTBJP Trust," and another 125,000 shares to Granger, thereby leaving only 25,000 authorized but not issued shares.  See Written Consent Action of the Board of Directors dated December 18, 2008 (attached hereto as Pls. Ex. 5; "1st Written Consent");

- The second written consent action purportedly issued another 250,000 shares of common stock to the LKDTBJP Trust and 250,000 shares of common stock to Granger, even though only 25,000 authorized shares remained to be issued after the 1st Written Consent Action.   See Written Consent Action of the Board of Directors dated December 18, 2008 (attached hereto as Pls. Ex.  6; "2nd Written Consent");

- The third written consent action purportedly issued (i) an additional 225,000 shares of common stock to the Reiner, (ii) an additional 225,000 shares of common stock to Granger, and (iii) 125,000 shares to Spectra-Delaware, even though no authorized shares remained to be issued after the 2nd Written Consent Action.   See Written Consent Action of the Board of Directors dated December 18, 2008 (attached hereto as Pls. Ex. 7; also filed as Reiner Exhibit F; "3rd Written Consent").  This 3rd Written Consent also purported to expand the Board to three directors and to appoint Brewer Reiner as the third director, even though the number of Directors had already been fixed at three just two days earlier by Kostrubanic.

- The fourth written consent action purportedly approved the Spectra-Delaware Asset Purchase Agreement and Employment Agreements for both Reiner and Granger. <u>See</u> Written Consent Action of the Board of Directors dated December 18, 2008 (attached hereto as Pls. Ex. 8; also filed as Reiner Exhibit D "4th Written Consent").

The upshot of these written consent actions – which can better be described as self-dealing by the Defendants – was to issue a total number of 825,000 shares (i.e. 125,000 shares to the LKDBJP Trust, 225,000 shares to Reiner, 350,000 shares to Granger, and 125,000 shares to Spectra-Delaware), although the total number of authorized shares at this time was only 275,000, making the last three written consent actions void *ab initio*. The Defendants also assert that that the 3rd and 4th Written Consent Actions are false and fraudulent and that the purported signature of Granger to these documents has been forged. <u>See</u> Jt. Aff. at ¶¶ 8-9.

The sale of the "Evadri Bladder Control" business unit from Hollister to UroMed occurred on or shortly after January 2, 2009, subject to Hollister's receipt of a cash payment of $200,000 from Mr. Feltman. Completely unaware of Reiner's self-dealing with this wife, Feltman arranged for Plaintiff Kenneth Feltman Insurance Trust ("Feltman Trust") to send $200,000 to Hollister on January 3, 2009. <u>See</u> Jt. Aff. at ¶ 10. Accordingly, having fulfilled the obligation in the Seneca Hotel Agreement to furnish $200,000 in good funds, the Feltman Trust had an equitable right effective January 3, 2009 to exercise all the rights of a shareholder with twenty-five percent (25%) ownership of UroMed, and Feltman individually had an equitable right to exercise all powers and duties as a Director of a three-member UroMed Board. Indeed, the Plaintiffs have since conceded that Feltman should have been made a director "at the time the $200,000 investment into the Company was made." <u>See</u> Minutes of the Special Meeting of the Shareholders of UroMed

Technology, Inc. at 2 (May 22, 2009; attached hereto as Pls. Ex. 9; also filed as Reiner Exhibit I).

Several days before the Evadri closing, Reiner prepared and signed a fifth written consent action of the Board that purportedly approved an increase in the authorized capital stock of the Corporation from 275,000 to 1,250,000 shares of common stock. See Written Consent Action of the Board of Directors dated December 29, 2008 (attached hereto as Pls. Ex. 10; "5[th] Written Consent").   This was followed by a written consent action of UroMed shareholders that Reiner prepared on January 7, 2009 and which purported to approve the Board's decision to increase the authorized capital stock from 275,000 to 1,250,000 shares. See Unanimous Written Consent Action of Shareholders dated January 7, 2009 (attached hereto as Pls. Ex. 11).   This document is void *ab initio*, however, because it improperly failed to include the Feltman Trust as a shareholder of UroMed, and no authorized representative of the Feltman Trust ever consented to this increase in the authorized capital stock of UroMed.   See Jt. Aff. at ¶ 11.   This "Unanimous Written Consent Action of Shareholders" therefore was *not* unanimous.

Notwithstanding his failure to obtain the unanimous consent of UroMed shareholders, Reiner improperly and without authorization signed Articles of Amendment on January 7, 2009 that purported to increase the authorized capital stock of the Corporation from 275,000 to 1,250,000 shares. Kostrubanic (or his law firm McCarter & English) subsequently filed these false Articles of Amendment with the Corporations Division of the Secretary of the Commonwealth of Massachusetts on March 6, 2009. See Articles of Amendment signed January 7, 2009 and filed March 6, 2009 (attached hereto as Pls. Ex. 12).

The self-dealing between Reiner and his wife continued when Reiner prepared and executed a written consent action that purportedly approved a $50,000 "Credit Facility" in favor or Brewer Reiner.  See Written Consent Action of the Board of Directors dated "March __, 2008" (attached hereto as Pls. Ex. 13; also filed as Reiner Exhibit H; "6[th] Written Consent").[3]  Under this "Credit Facility" Brewer Reiner was to lend UroMed up to $50,000 at a rate of seven percent (7%), with the loan amount fully repayable within six months.  In consideration for this loan, Brewer Reiner would receive (i) 50,000 shares of UroMed common stock at $0.01 par value and (ii) warrants to purchase 50,000 shares of UroMed common stock at a strike price of $0.50 per share during the four-year period following the date of the Credit Facility.  Id.  This 6th Written Consent is void *ab initio* because it failed to include Feltman as a Director of UroMed, and in any event Feltman never signed or consented to it.  This 6th Written Consent is also void *ab initio* as false and fraudulent because the purported signature of Granger to this document has been forged. See Jt. Aff. at ¶ 12.

Reiner prepared and executed a final written consent action on March 20, 2009 that purportedly issued 115,000 shares of common stock to the Feltman Trust.  See Written Consent Action of the Board of Directors dated March 20, 2009 (attached hereto as Pls. Ex. 14; "7[th] Written Consent").  This 7th Written Consent is void *ab initio* because (i) it improperly identifies Reiner, Granger, and Brewer Reiner as "all the Directors of UroMed

---

[3] Although the copy of this Written Consent Action given to Plaintiffs was undated, the Defendants now disclose that it took place on or about March 16, 2009 and have filed a copy with the date filled in, noting that "2008" was an error and should have read "2009."  See Reiner Affidavit at ¶ 11. As further evidence of the Defendants' self-dealing, it should be noted that while Reiner accuses Feltman of reneging on a promise to invest $50,000 for 50,000 shares, it can be seen from this "Credit Facility" that Reiner had no problem giving his wife these same 50,000 shares, plus 50,000 warrants, for a $50,000 *loan* that would be completely repaid with favorable interest within six months.

Technology, Inc.";[4] (ii) it fails to include Feltman as a Director of UroMed; and (iii) Feltman never signed or consented to it.  This 7[th] Written Consent is also void *ab initio* as false and fraudulent because the purported signature of Granger to this document has been forged. See Jt. Aff. at ¶¶ 13-14.  Significantly, in early May 2009, Reiner had reversed his position regarding these 115,000 shares to the Feltman Trust, when he authorized his attorney to acknowledge that "the Feltman Insurance Trust should have received 206,250 shares, rather than the 115,000 shares specified in the documents and enabling resolutions."  See Letter dated May 6, 2009 from Walter R. Turner to Michael Y. Granger at 4-5 (attached hereto as Pls. Ex. 15; also filed as Turner Exhibit B).

On April 14, 2009, via email transmission at 12:04AM, Granger (as Chairman, Director, and Secretary) and Feltman (as Director) furnished Reiner with proper written notice of a UroMed Board meeting scheduled for April 16, 2009 at 1:00PM at the Georgetown Suites Hotel, 1111 30th Street, N.W., Washington, DC  20007, which any Director could attend in person or by remote communications as a teleconference participant.  See Notice of Special Meeting of UroMed Technology, Inc. Board of Directors on April 16, 2009 (attached hereto as Pls. Ex. 16).  Brewer Reiner was invited to the open session portion of this Board meeting and was also given proper written notice of the meeting for that purpose.  Id.  In a letter to Granger dated April 14, 2009 (attached hereto as Pls. Ex. 17; also filed as Turner Exhibit A), the attorney representing Reiner, Brewer Reiner, and Spectra-Delaware, Walter R. Turner of Wendel Rosen Black & Dean LLP of Oakland, California ("Turner") confirmed that Reiner and Brewer Reiner received actual

---

**4**   Perhaps most damaging to the Defendants claim that Ms. Brewer Reiner became a director on December 18, 2008 is that the very same "operative agreements" in California that supposedly undermine personal jurisdiction in Illinois are all "unanimous" Written Consent Actions dated on or after December 18, 2008 and yet Brewer Reiner is nowhere mentioned on these "operative agreements" as a "director."

notice of the Board meeting scheduled for April 16, 2009, but that they would refuse to attend on the grounds that Brewer Reiner was not listed on the notice as a Director of UroMed.

Notwithstanding this knowing refusal of Reiner to attend the April 16, 2009 Board meeting either in person or via teleconference, Granger and Feltman proceeded with the meeting as scheduled since together they constituted a majority of the three-member Board, which established a quorum of the Board of Directors pursuant to Article II, Section 12 of the Bylaws of the Corporation. See Bylaws of UroMed Technology, Inc. at Article II, Section 12 (attached hereto as Pls. Ex. 18; also filed as an attachment to Reiner Exhibit E). During the course of this April 16, 2009 meeting, the Board took various authorized actions*, inter alia*, to (i) remove Reiner as President and Chief Executive Officer of UroMed; (ii) elect Feltman as Chairman of the UroMed Board; (iii) appoint Granger as President and Chief Executive Officer of UroMed; (iv) appoint Feltman as Secretary and Treasurer of UroMed; and (v) remove Brewer Reiner as a Vice President of UroMed. See Minutes of April 16, 2009 Meeting of the Board of Directors of UroMed Technology, Inc. (attached hereto as Pls. Ex. 19).

Following his removal as President and CEO of UroMed, Reiner has continued to take unauthorized actions to the detriment of the Defendants, including but not limited to the following:

- On April 30, 2009, Reiner purported to have his wife's company, Spectra-Delaware exercise warrants for 125,000 shares of common stock pursuant to the false and fraudulent Spectra-Delaware Asset Purchase Agreement. See Letter dated May 6, 2009 from Walter R. Turner to Michael Y. Granger at 2 (attached hereto as Pls. Ex. 15; also filed as Turner Exhibit B).

- On May 22, 2009, Reiner purported to call a special shareholders' meeting as President and CEO of UroMed, at which the Bylaws were changed to increase the number of Board members to five and one Allen Korn was named to fill the new vacancy on the UroMed Board. See Minutes of the

Special Meeting of Shareholders of UroMed Technology, Inc. at 2 (May 22, 2009; attached hereto as Pls. Ex. 9; also filed as Turner Exhibit C).

- On May 28, 2009, Reiner purported to call a special shareholders' meeting as President and CEO of UroMed, at which (i) an annual meeting of the shareholders was scheduled for Friday, June 5, 2009 at 2:00 p.m. PDT at the law offices of Wendel Rosen Black & Dean LLP, Oakland, California; and (ii) Granger was removed as Chairman of the Board and any other corporate offices of UroMed; (iii) Reiner was appointed as the new Chairman of the Board of UroMed; (iv) a director's fee of $1,000 per month was approved for Allen Korn "effective immediately;" and (v) Reiner was authorized to engage the Oakland law firm of Fitzgerald Abbott & Beardsley to represent UroMed "on a number of urgent [but unspecified] business matters in California." See Minutes of the Special Meeting of the Shareholders of UroMed Technology, Inc. at 2-3 (May 28, 2009; attached hereto as Pls. Ex. 20; also filed as Turner Exhibit E).

Reiner and the other Defendants are using these numerous unauthorized actions to assert that Granger and Feltman are "no longer either officers or directors of UroMed" and that the Plaintiffs' actions to protect UroMed and their investments must now be construed as "diverting corporate opportunities and assets for their own benefit." Defs. Supp. Memo. at 4. In fact, it is the Defendants who are acting without authority and diverting the monies that are being generating in Illinois by Hollister under the current Transition Services Agreement between Hollister and UroMed.

## **Argument**

### A.    THE COURT HAS PERSONAL JURISDICTION OVER DEFENDANT REINER BASED ON THE SENECA HOTEL MEETING.

Since this is a diversity case, the Court would only have personal jurisdiction over the Defendants if an Illinois state court would have such jurisdiction. *Snyder v. Smith*, 736 F.2d 409, 415 (7th Cir. 1984) (citing *Deluxe Ice Cream Co. v. R.C.H. Tool Corp.*, 726 F.2d 1209, 1212 (7th Cir. 1984)). Accordingly, Plaintiffs must satisfy the Illinois Long-Arm Statute, 735 ILCS 5/2-209 et seq., as permitted by the Due Process Clause of the Federal

Constitution.  *Snyder,* 736 F.2d at 416*; Deluxe Ice Cream*, 726 F.2d at 1212.  This is a two-part analysis based on: (1) whether the jurisdictional facts fall within the statutory reach of the Illinois Long-Arm Statute; and (2) whether an assertion of personal jurisdiction is "consistent with traditional notions of fair play and substantial justice."  <u>Id</u>. (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  In satisfying this test, Plaintiffs only need to establish a *prima facie* case of jurisdiction, and the Court must construe the pleadings and affidavits or other supporting documentation in favor of the Plaintiffs, drawing all inferences and resolving all factual disputes in Plaintiffs' favor. *Deluxe Ice Cream*, 726 F.2d at 1215.

Pending discovery that may establish "general jurisdiction" over the Defendants as a result of "continuous and systematic" activities in Illinois (such as their "doing business" in Illinois under 735 ILCS 5/2-209(b)(4)), Plaintiffs are asserting "specific jurisdiction" under the long-arm provision that extends jurisdiction over "any cause of action arising from … [t]he transaction of any business within [Illinois]."  735 ILCS 5/2-209(a)(1).  In this case, specific jurisdiction over Defendant Reiner arises from his having negotiated an investment and shareholder's agreement in Chicago from which the Plaintiff's causes of action arise.

The details of this meeting are set forth in the Joint Affidavit of Plaintiffs Granger and Feltman and show that the parties reached a wide range of agreements and understandings, including *inter alia* the amount of money that Feltman would be investing; the ownership percentages in the new company; how Reiner's shares would be adjusted upward or downward depending on the value of Defendant Spectra-Delaware's assets; and both the size and membership of the UroMed Board, as well as guarantees of future representation on the Board.  <u>See</u> Jt. Aff. at  ¶ 5.  The Defendants denigrate this meeting as "inconsequential," but in fact it lasted two days and was the only face-to-face meeting

between Reiner, Granger, and Feltman prior to the incorporation of UroMed and the Feltman Trust's $200,000 investment.  Most importantly, it was this meeting that set in motion the chain of events leading to this dispute by prompting (i) the incorporation of UroMed, (ii) the unauthorized "Written Consent Actions" by Reiner that violated the understandings reached at the Seneca Hotel Meeting, and (iii) the subsequent payment of the $200,000 to Hollister.

Even the Defendants admit that "[i]n the wake of the … [Seneca Hotel] meeting, it was decided that a new company, UroMed Technology, Inc. would be formed to acquire the Hollister business."   Defs. Supp. Memo. at 2.  Given this admission, and the fact that UroMed was incorporated *just six days later* on December 16, 2008, it is peculiar (to say the least) that the Defendants are now trying to argue that the "Written Consent Actions" dated December 18, 2008 were the "operative agreements," Defs. Supp. Memo. at 8 & 9, even though these Board actions were not signed by Feltman or in some cases even by Granger.   Obviously, to the extent that these "Written Consent Actions" were truly authorized, they merely reflected agreements reached one week earlier at the Seneca Hotel.   The Defendants' focus on the "Written Consent Actions" is an obvious and transparent attempt to generate a nexus with California without any foundation.  Indeed, the degree to which the Defendants are straining to establish this California connection is demonstrated by their assertion that December 18, 2008 – the purported date of the various "Written Consent Actions" – was "*well after* the Illinois meeting took place" (emphasis added).  One week is hardly "well after," especially when Reiner was rushing to incorporate UroMed during that intervening week.

The Defendants of course deny that any agreement was reached at the Seneca Hotel Meeting, <u>see</u> Defs. Supp. Memo. at 2 & 6, but even if this were true, it would not

preclude a finding of "specific jurisdiction."  First, it is well-settled that a single act can be the basis of jurisdiction as long as the cause of action arises from that act.  *Snyder,* 736 F.2d at 416.  <u>Accord</u> *McGee v. International Life Insurance Co*., 355 U.S. 220, 223 (1957).  Moreover, the Seventh Circuit has long held that mere discussions in Illinois are sufficient to establish jurisdiction if the discussions lead to the contract upon which the plaintiff suing. *Deluxe Ice Cream*, 726 F.2d at 1215-16.  Indeed, this is true even if the subsequent contract is between the plaintiff and a third-party that was not actually part of the discussions in Illinois.  <u>Id</u>.  In this case, *even under the Defendants' version of the facts*, the discussions at the Seneca Hotel not only led to a subsequent agreement upon which this action is based, the discussions were between the very parties to the contract.  Under the principles set forth in *Deluxe Ice Cream* and *Snyder*, the Seneca Hotel Meeting establishes personal jurisdiction over Reiner whether or not an agreement was consummated at the meeting.

B.    THE COURT SHOULD PERMIT JURISDICTIONAL DISCOVERY WITH <u>RESPECT TO ALL DEFENDANTS.</u>

The Court should not take at face value the representations of Reiner that neither he nor the other Defendants have other Illinois contacts besides the Seneca Hotel Meeting simply because they "reside outside of Illinois, and are not alleged to have had any contacts with the forum state."  Defs. Supp. Memo. at 6 & 7.  Saying that a Complaint filed in state court *alleges* insufficient forum contacts is not the same thing as the Defendants actually *denying* such forum contacts, and indeed the Defendants are careful to avoid any declarations about their contacts with Illinois, except to address the Seneca Hotel Meeting, which can hardly be avoided under the circumstances.

What the Defendants do concede is that Reiner was the individual who consummated the Evadri acquisition after many months of negotiation, not just on behalf of UroMed, but also on behalf of an earlier Massachusetts corporation Spectra Medical Products, Inc. ("Spectra-Massachusetts") in September 2008. Defs. Supp. Memo. at 2. In fact, even prior to forming Spectra-Massachusetts, Reiner had attempted to purchase the Evadri assets through yet a third corporation called MTM Healthcare Group, Inc. See Letter of Intent dated July 8, 2008 from Thomas F. Reiner to John Swanson (attached hereto as Pls. Ex. 21). Reiner necessarily had extensive contacts with Hollister in Illinois throughout these months of negotiations, and Plaintiffs are entitled to take discovery on these communications, including any visits to Illinois or meetings at Hollister's offices. By the same token, Defendants admit that Ms. Brewer Reiner and the other Defendants were involved in this transaction from the very beginning, as evidenced by:

- Reiner's attempt to place his wife on the UroMed Board just two days after UroMed was incorporated (see 3rd Written Consent Action dated December 18, 2008; attached hereto as Pls. Ex. 7);

- the purported Spectra-Delaware Asset Purchase Agreement dated December 18, 2008 (attached hereto as Pls. Ex. 4), which only Reiner and his wife signed and which immediately claimed to make Brewer Reiner a UroMed corporate officer;

- the fact that Reiner immediately placed all of his UroMed stock in the name of the LKDTBJP Trust (see 1st Written Consent Action dated December 18, 2008; attached hereto as Pls. Ex. 5).

At this early stage of the lawsuit, the Plaintiffs cannot be expected to have unraveled the tangled web of corporate and financial relationships between the four Defendants in terms of (i) their involvement with Hollister and UroMed for purposes of "specific jurisdiction"; (ii) whether their other contacts with Illinois have been "continuous and systematic" enough to establish "general jurisdiction" regardless of their involvement with Hollister and UroMed; and (iii) whether the relationships between Defendants Reiner

and Brewer Reiner, on the one hand, and Defendants Spectra-Delaware and the LKDTBJP Trust, on the other hand, are "sham" or "alter ego" relationships such that the jurisdictional contacts of one can be attributed to the other under the "fiduciary shield" doctrine.  See *YKK USA, Inc. v. Baron*, 976 F.Supp. 743, 747 (N. D. Ill. 1997); *Perry v. Delaney*, 5 F.Supp.2d 617, 620 (C.D. Ill. 1998).  In light of these many unanswered questions, the Plaintiffs should be permitted to take jurisdictional discovery on these issues if the Court determines that the Seneca Hotel Meeting is insufficient by itself to establish personal jurisdiction over all four Defendants.

D.     VENUE IS PROPER SINCE A "SUBSTANTIAL PART" OF THE BOTH THE PREDICATE EVENTS OCCURRED, AND SUBJECT PROPERTY IS SITUATED, IN THIS DISTRICT.

Venue is proper in this district because the Seneca Hotel Meeting represents a "substantial part of the events or omissions giving rise to the claim" for purposes of 28 U.S.C. § 1391(a)(1).  In this regard, the Plaintiffs do not need to show that "a majority of events took place" in the forum district, only that a "substantial part" of the events occurred here.  *Schwarz v. National Van Lines, Inc.*, 317 F.Supp.2d 829, 834 (N.D. Ill. 2004). "Substantial" in this context means simply that the events occurring in the forum district "must be part of the historical predicate of the claim."  Id.  The Seneca Hotel Meeting clearly satisfies this requirement.  Moreover, the Evadri assets themselves constitute a "substantial part of property that is the subject of the action," and these assets are still "situated" in this district.  28 U.S.C. § 1391(a)(1).  Of course, jurisdictional discovery may well establish other significant events occurring in the forum district that will strengthen this finding of venue.

E.   THE CONVENIENCE OF THE PARTIES AND WITNESSES AND THE
INTEREST OF JUSTICE BOTH FAVOR KEEPING THIS CASE IN ILLINOIS.

The various factors to be considered under § 1404(a) favor keeping this case in

Illinois.  First, "[a] plaintiff's choice of forum is entitled to substantial weight under section

1404(a), particularly where it is also the plaintiff's home forum."  *Schwarz*, 317 F.Supp.2d

at 835.  In this case, the Northern District of Illinois is the home forum of Plaintiff Granger

who is suing both as an individual and a UroMed Board member, and as the UroMed

officer who authorized this lawsuit in his capacity as President and CEO of UroMed.

Second, the material events took place in Illinois as discussed above in regard to

both jurisdiction and venue.

Third, with one exception, the only material non-party witnesses in this case will be

associated with Hollister here in Illinois.  Thus, to the extent that compulsory process is

necessary, only an Illinois can assure attendance at depositions and trial.  The one

exception is John Kostrubanic, the Massachusetts attorney who incorporated UroMed at

the direction of Reiner.  Since Kostrubanic is not in either Illinois or California, his presence

in the case may be disregarded for purposes of this analysis.[5]

Fourth, Defendants argue that the books and records of both UroMed and Spectra-

Delaware are located in California, but it is unlikely that these corporate records are

extensive or that it would be burdensome to produce in electronic form.  They are also

party records in this case and thus subject to Court's discovery orders regardless of their

location.  The more important records relate to Hollister and the Evadri acquisitions, and

_____

[5]  In order to help manufacture a nexus to California, Defendants have attached affidavits from their
California attorneys in support of their dismissal or transfer motion.  These attorneys can only
furnish self-serving testimony as to events that occurred after the dispute arose and cannot be
considered material witnesses in any legitimate sense.

are either financial in nature or involve communications between Hollister and Reiner/Brewer Reiner.  These records would be in Illinois, where it would obviously be more convenient to subject them to discovery if the case remained here.

Fifth and last, the Defendants have offered no reasons why the "interests of justice" – which relate to the "efficient functioning of the courts" – would compel a transfer to California.

The bottom line is that "[t]ransfer is inappropriate if it merely transforms an inconvenience for one party into an inconvenience for another party.  *Schwarz*, 317 F.Supp.2d at 835.   For this reason, it is the Defendants who have the burden of proving "'that the transferee forum is clearly more convenient' than the transferor court."   Id. (quoting *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219-220 (7th Cir. 1986)).   The Defendants have failed to carry this burden.

## <u>Conclusion</u>

For the reasons stated above, Defendant's Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, or in the Alternative to Transfer for Improper Venue or for Convenience should be denied; or, alternatively, the Court should defer a ruling pending jurisdictional discovery.

Respectfully submitted,

Attorney for Plaintiffs

By: ___/s/ Brian R. Porter_____
    Brian R. Porter
    120 W. Madison – Suite 505
    Chicago, Illinois 60602
    (773) 209-6890 direct dial
    (312) 920-1745 phone
    (312) 920-1749 fax